# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
May 13, 2010 Session

## JEAN HENSLEY v. ROBERT CERZA ET AL.

### Appeal from the Circuit Court for Putnam County
### No. 06N0166     John J. Maddux, Jr., Judge

---

### No. M2009-01860-COA-R3-CV - Filed August 25, 2010

---

A jury returned a verdict in favor of the defendants in this medical malpractice action. On appeal, the plaintiff assigns error to various decisions made by the trial court concerning the admission of evidence and arguments and to the trial court's grant of summary judgment on the plaintiff's claim of negligent retention. While the trial court erred in several respects, we consider the errors to be harmless and affirm the judgment based on the jury verdict.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed

ANDY D. BENNETT, J., delivered the opinion of the Court, in which RICHARD H. DINKINS, J., joined. FRANK G. CLEMENT, JR., J., filed a concurring opinion.

Stephen C. Knight and Nader Baydoun, Nashville, Tennessee, for the appellant, Jean Hensley.

Heidi Anne Barcus, Knoxville, Tennessee, and Donald W. Darby, Louisville, Kentucky, for the appellees, Robert Cerza, M.D. and Cardiac Anesthesia Services, PLLC.

## OPINION

### FACTUAL AND PROCEDURAL BACKGROUND

Jean Hensley was admitted to Cookeville Regional Medical Center ("CRMC") on March 29, 2004, for removal of an intrathoracic goiter. Dr. Robert Cerza, the anesthesiologist for Ms. Hensley's surgery, inserted a double lumen tube into her trachea to allow one of the lungs to be deflated, thereby facilitating surgery in the chest cavity. During this process, Ms. Hensley sustained a tracheal laceration, a life-threatening complication that required additional surgical procedures and resulted in a prolonged recovery period.

Ms. Hensley filed this suit in June 2006 against Dr. Cerza and Cardiac Anesthesia Services, PLLC ("CAS"), for medical malpractice. The court subsequently permitted Ms. Hensley to amend her complaint to include a claim for negligent retention against CAS. In March 2009, the court granted the defendants' motion for partial summary judgment on the negligent retention claim.

In February 2009 after extensive discovery, the defendants filed motions in limine to exclude certain testimony from various witnesses. With respect to named non-physician members of the surgical team, the court ruled:

> The testimony . . . is limited to lay witness testimony regarding what they heard and observed in the operating room on March 29, 2004. These witnesses are excluded from providing any expert opinion testimony regarding the technique Dr. Cerza used in the intubation including but not limited to any characterization of Dr. Cerza's intubation as "forceful."

During the trial, Ms. Hensley made offers of proof with respect to testimony ruled by the court to be inadmissible.

The case was tried before a jury from March 2 through March 9, 2009. The plaintiff's proof included the testimony of Lisa Poe, a registered nurse; Ms. Hensley's son and daughter; Jimmy Brock, a surgical technician; Ms. Hensley; the hospital's director of surgery; another surgical technician; and another registered nurse. Ms. Hensley's counsel also had read into the record portions of the testimony of Dr. Robert Wilson, the cardiothoracic surgeon who was called in to repair the tracheal laceration. The plaintiff's final witness on direct proof was her expert witness, Dr. Dennis Doblar, an anesthesiologist. At the close of the plaintiff's proof, Dr. Cerza moved for a directed verdict based upon the plaintiff's alleged failure to prove the applicable standard of care. Dr. Cerza also moved for a directed verdict on the issue of punitive damages. The court took these motions under advisement. The defendants put on testimony from expert witnesses: Dr. Arthur Grimball, a cardiothoracic surgeon; Dr. Dan Cotten, a radiologist; and Dr. Alex Woodruff, a cardiac anesthesiologist. Dr. Cerza himself also testified. Dr. Cerza renewed his motions for a directed verdict at the end of the defendants' proof. In rebuttal, the plaintiff put on more expert testimony from Dr. Doblar.

The jury returned a verdict in favor of the defendants, and the court thereafter denied Dr. Cerza's motions for a directed verdict. On April 13, 2009, the trial court entered judgment in favor of the defendants. Ms. Hensley filed a motion for a new trial on April 7, 2009, which was denied by the court on August 26, 2009. This appeal followed.

On appeal, Ms. Hensley argues that the trial court erred in excluding certain testimony by two non-physician members of the surgical team, in excluding an argument of plaintiff's counsel during closing arguments, in allowing certain testimony by defense expert witnesses, and in granting the defense motion for partial summary judgment on the claim of negligent retention. The defendants assert that the trial court erred in denying their motions for a directed verdict on the basis that the plaintiff failed to prove the applicable standard of care and on the issue of punitive damages.

EYEWITNESS TESTIMONY

Ms. Hensley asserts that the trial court erred in excluding certain testimony of two members of the surgical team: nurse Lisa Poe and scrub technician Jimmy Brock. By excluding this testimony, she argues, the trial court prevented her from presenting compelling testimony to support her theory in this case: that Dr. Cerza encountered resistance as he advanced the double lumen tube and used excessive force to push through the resistance.

With respect to this issue and others regarding the admission or exclusion of evidence, we review the trial court's decision under an abuse of discretion standard. *Brown v. Crown Equip. Corp.*, 181 S.W.3d 268, 273 (Tenn. 2005); *Mercer v. Vanderbilt Univ., Inc.*, 134 S.W.3d 121, 131 (Tenn. 2004). Under this standard, we are required to uphold the trial court's ruling "as long as reasonable minds could disagree about its correctness." *Caldwell v. Hill*, 250 S.W.3d 865, 869 (Tenn. Ct. App. 2007). So, "we are not permitted to substitute our judgment for that of the trial court." *Id*. An appellate court "will set aside a discretionary decision only when the trial court has misconstrued or misapplied the controlling legal principles or has acted inconsistently with the substantial weight of the evidence." *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999). We review a trial court's discretionary decision to determine: "(1) whether the factual basis for the decision is supported by the evidence, (2) whether the trial court identified and applied the applicable legal principles, and (3) whether the trial court's decision is within the range of acceptable alternatives." *Id.*

We begin by examining the testimony of Ms. Poe and Mr. Brock that was allowed and excluded by the trial court. The court allowed the following testimony from Ms. Poe concerning Dr. Cerza's insertion of the tube:

Q. Can you describe what you saw and what you heard with respect to how Dr. Cerza inserted the tube in Ms. Hensley?

A.  It's just sort of one fluid motion with a turn on the end.  One motion with a turn.  And then at the end, when it's inserted, you take the stylet, I would pull it out.  Is that what you're asking?

Ms. Hensley objects to the court's exclusion of testimony by Ms. Poe that Dr. Cerza shoved or rammed the double lumen tube down Ms. Hensley's throat quickly and forcefully, that Ms. Poe involuntarily grimaced because of the way Dr. Cerza inserted the tube, and that Dr. Cerza used more force than Ms. Poe had seen any anesthesiologist use before.

The court allowed testimony from Mr. Brock that Dr. Cerza began inserting the tube, that he paused, that his hand turned white and he grunted, and that he pushed the tube down more.  Ms. Hensley assigns error to the court's exclusion of testimony by Mr. Brock that Dr. Cerza appeared to encounter "quite a bit" of resistance, that he increased the amount of force he used (to the extent that he grunted and his hand turned white), that he crammed the tube down Ms. Hensley's throat, that he tried to force the tube in, and that Dr. Cerza was the only anesthesiologist Mr. Brock had seen who increased the amount of force when he encountered resistance during an intubation.

The trial court did not specify which evidentiary rule it was applying in excluding the testimony at issue.  Ms. Hensley argues that the trial court abused its discretion in applying Tenn. R. Evid. 702, concerning opinion testimony by experts, rather than Tenn. R. Evid. 701, concerning lay opinion testimony.  In its pretrial order, the trial court specifically stated that these witnesses could not give "any expert opinion regarding the technique Dr. Cerza used in the intubation including but not limited to any characterization of Dr. Cerza's intubation as 'forceful.'"  During the trial, the court ruled on a number of objections to specific testimony.  In so doing, the court sometimes explained its ruling by stating that the hospital staff could not offer expert opinions.  Tenn. R. Evid. 702 has no application to the testimony of Ms. Poe and Mr. Brock since the plaintiff did not present either witness as an expert or attempt to qualify them as experts.[1]

The relevant evidentiary rule in this case is found in Tenn. R. Evid. 701(a), which states:

If a witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and

---

[1] Unlike non-experts, experts are permitted, under certain circumstances, to state opinions based on facts or data not within their personal knowledge.  *See* Tenn. R. Evid. 703; Neil P. Cohen, Sarah Y. Sheppeard & Donald F. Paine, TENN. LAW OF EVID. §§ 7.01[4][b], 7.03[2].

(2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.

This rule, as amended in 1996, reflects the trend in favor of allowing lay opinion testimony under certain circumstances:

> Although American law traditionally has treated lay opinion testimony as an unpopular relative who keeps appearing at family reunions, there is now a recognition that this relative not only should be invited to the gathering but may be a contributing part of the family. . . . The reason for this [trend in favor of allowing the admission of lay opinion testimony] is simple: sometimes lay opinion testimony is both necessary and valuable. The lay witness may not be able to provide helpful proof without giving an opinion. For example, how could a witness testify about age, identity, speed, or height without delving into the realm of opinion? What is helpful is the witness's total impression, not the constituent elements.

Neil P. Cohen, Sarah Y. Sheppeard & Donald F. Paine, TENN. LAW OF EVID. § 7.01[3]. Tenn. R. Evid. 602 requires that a witness who is not an expert have personal knowledge of the matter about which he is testifying.

Under Tenn. R. Evid. 701(a), lay opinion testimony is permissible if "rationally based on the perception of the witness" and "helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." The statements excluded by the trial court describe the amount of force used by Dr. Cerza in pushing the tube down Ms. Hensley's throat. Both Ms. Poe and Mr. Brock witnessed Dr. Cerza's actions in inserting the double lumen tube. Both had seen many intubations and were, therefore, able to compare the amount of force applied by Dr. Cerza to the force they had seen applied by other anesthesiologists. This evidence appears to be rationally based on the witnesses' perception and helpful to a clear understanding of what happened during the intubation.

In arguing that this evidence was properly excluded, the defendants assert that "opinions regarding the force exerted and the resistance encountered by Dr. Cerza were expert opinions that a nurse and a scrub technologist are not qualified to offer." They go on to cite the Medical Malpractice Act, which requires expert testimony to establish the applicable standard of care, breach of the standard of care, and causation. Tenn. Code Ann. § 29-26-115(a), (b). Tenn. R. Evid. 701 does "not authorize lay testimony on subjects that require special skill or knowledge outside the realm of common experience." Neil P. Cohen, Sarah Y. Sheppeard & Donald F. Paine, TENN. LAW OF EVID. § 7.01[4][b]. The excluded testimony does not, however, establish the applicable standard of care, breach of that

standard, or causation. The testimony at issue describes what happened in the operating room; it does not indicate whether Dr. Cerza acted properly or not. There is a distinction between the amount of force applied and whether that force was excessive or appropriate; lay opinion is proper as to the former, but not as to the latter. If a lay witness testified that Dr. Cerza applied "excessive" or "improper" force, that testimony would properly be excluded.

Two cases, are discussed by the parties. In *State v. Brown*, 836 S.W.2d 530 (Tenn. 1992), a murder case, the court determined that the trial court properly allowed a nurse who helped treat the victim to testify as a lay witness that one of the victim's injuries looked like a cigarette burn. *Id.* at 550. *Brown* was decided prior to the 1996 amendment to Tenn. R. Evid. 701.[2] According to the general rule applicable at that time, a non-expert witness had to confine her testimony "to a narration of the facts based on first-hand knowledge and avoid stating mere personal opinions or their conclusions or opinions regarding the facts about which they have testified." *Id.* An exception was recognized where opinion testimony "describes the witness's observations in the only way in which they can be clearly described, such as testimony that a footprint in snow looked like someone had slipped or that a substance appeared to be blood.." *Id.* (citations omitted). Although the standard now embodied in Tenn. R. Evid. 701(a) is less restrictive, we do not consider the result in *Brown* to be inconsistent with the admission of the evidence at issue in the present case. Ms. Poe and Mr. Brock could not adequately describe Dr. Cerza's actions without describing the degree of force they saw him use, just as a car accident witness might describe the speed at which a car was traveling.

By contrast, the court in *Brown* found error in the trial court's admission of a paramedic's testimony concerning the cause of the victim's bruises and the length of time it would take for such bruises to develop. *Id.* at 549-50. The court reasoned that the paramedic's testimony "called for specialized skill or expertise" and should not have been permitted. *Id.* at 550. In the present case, the witnesses' description of the amount of force applied by Dr. Cerza did not require special skill or expertise. As the defendants assert, "it is a matter of medical judgment how much force to exert and what is an expected amount of resistance to encounter." These witnesses did not, however, testify about what amount of force was proper or what amount of resistance would be expected. Rather, the excluded testimony merely describes what they saw–i.e., that Dr. Cerza introduced the tube forcefully and appeared to meet resistance.

---

[2]Prior to the 1996 amendment, Rule 701 precluded lay opinion if the witness could substitute facts for opinion. Tenn. R. Evid. 701 cmt.

In the second case, *State v. Wallace*, No. M1999-02187-CCA-R3-CD, 2001 WL 208511, at *3-4 (Tenn. Crim. App. Mar. 1, 2001), the trial court allowed a police officer who participated in a raid on the defendant's home to testify that the quantity of drugs seized was "in the top five percent" of the amounts from their seizures from crack houses. Applying Tenn. R. Evid. 701(a), the appellate court reasoned that the testimony was rationally based on the officer's perception since he was present at the raid and compared the amount to other crack houses he had raided. *Id.* at *5. The court further reasoned that the testimony at issue was helpful to a clear understanding of the officer's testimony because it would allow the jury to assess whether the defendant intended to sell the cocaine or keep it for personal use. *Id.* The court therefore found no error in the admission of the evidence. We see no conflict between *Wallace* and our conclusion in the present case.

From the language used by the trial court in making its rulings and from the rulings themselves, it appears to this court that the trial court did not apply the proper standards, which are found in Tenn. R. Evid. 701. We, therefore, conclude that the trial court erred.

Pursuant to Tenn. R. App. P. 36(b), the erroneous exclusion of evidence does not require reversal of the judgment unless "error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." *See also* Tenn. R. Evid. 103(a); *White*, 21 S.W.3d at 223. We must, therefore, determine whether the erroneous exclusion of the evidence at issue was harmless or prejudicial to the plaintiff's case.

Looking at the evidence heard by the jury, in particular the testimony of Mr. Brock and of the plaintiff's expert, Dr. Doblar, we have concluded that the exclusion of the evidence probably did not affect the outcome of the case. Despite the trial court's exclusion of some of his testimony, Mr. Brock was able to testify that Dr. Cerza's hands turned white, that he grunted, and that he appeared to use an unusually high degree of force to push the tube into Ms. Hensley's throat:

Q. The best you can, describe for the jury what you saw as Dr. Cerza was intubating her.

A. He was lifting back on the jaw, like you do when you normally intubate, and he was inserting the tube, but as he was inserting the tube, he seemed to–
. . . .
He's tilting back, and he's inserting the tube like you normally do. And–but this time his hand seemed to be a little bit white from where he's pushing more than normal when intubating somebody, and then inserted it through.
. . . .

Q.  Can you describe what it [the tube] did?

A.  As he's inserting, he comes to a stopping point, for some reason, and then pushed down more.

. . . .

Q.  Could you tell me in more detail what you are talking about [regarding Dr. Cerza's hands]?

A.  Well, his fingertips and hands seemed to get white more than what they should have when you're inserting a tube.

[Objection sustained as to second part of the response.]

Q.  If you would, don't talk about what he should have.  You can go ahead and continue.

A.  His hands turned white and pushed it down more.

Q.  Did you hear Dr. Cerza–did you hear any sounds?

A.  There was a grunting sound.

Q.  Where did it come from?

A.  From Dr. Cerza.

Q.  How did the time of that sound compare with what you noticed about his hands?

A.  They were white at the same time.

This testimony gave the jury a picture of Dr. Cerza using force when inserting the tube into Ms. Hensley's throat.

In addition, Dr. Doblar, the plaintiff's expert witness, testified that Dr. Cerza used too much force and met an unusual amount of resistance when inserting the double lumen tube into Ms. Hensley's throat.  Dr. Doblar stated:

Based on review of the scans and reading deposition testimony and of all the people involved, knowing what Dr. [Lawrence] said about the small trachea

and knowing Ms. Hensley's size and the size of the double lumen tube that was used, Dr. Cerza applied too much force to the breathing tube. When he met resistance part way down, instead of stopping, taking the tube out, breathe for the patient with a mask, or put a single breathing tube in and breathe for the patient with that while they called Dr. Wilson for help. He continued to push on the endotracheal tube and that resulted in a laceration of virtually the entire length of the trachea.

Given the testimony heard by the jury, we conclude that the trial court's erroneous exclusion of testimony of Ms. Poe and Mr. Brock probably did not affect the outcome of the case.

CLOSING ARGUMENTS

Ms. Hensley also asserts that the trial court erred in prohibiting plaintiff's counsel from arguing reasonable inferences from the evidence in closing arguments. In specific, Ms. Hensley assigns error to the trial court's exclusion of statements by plaintiff's counsel characterizing Mr. Brock's testimony as "indicating that Dr. Cerza encountered resistance" and "that Dr. Cerza forced it [the double lumen tube] through."

A trial court generally has "broad discretion as to what shall and shall not be permitted in argument." *McCrory v. Tribble*, No. W2009-00792-COA-R3-CV, 2010 WL 1610587, at *6 (Tenn. Ct. App. Apr. 22, 2010) (quoting *Davis v. Hall*, 920 S.W.2d 213, 217 (Tenn. Ct. App. 1995)). We review these decisions under the abuse of discretion standard. *Id.*

In making their closing arguments, attorneys are generally confined to "the facts and evidence in the record and any reasonable inferences therefrom." *Id.* For the reasons discussed above with respect to the trial court's exclusion of portions of the testimony of Ms. Poe and Mr. Brock, we must conclude that the trial court erred in restricting the argument of plaintiff's counsel with respect to the reasonable inferences that could be drawn from the evidence as to the forcefulness applied by Dr. Cerza. We further conclude, however, that this error was not significant since similar arguments were allowed. For example, plaintiff's counsel made the following statements during closing arguments:

We know from the evidence that it clearly established that Dr. Cerza used too much force in intubating Mrs. Hensley. I am going to give you several reasons and then I'm going to go and analyze every one of those reasons.
. . . .
Let's talk about the first reason. It's obvious that [Dr. Cerza] would have had to encounter unusual resistance. The tube was too big for the trachea.

-9-

Everyone agrees that that's the case. Dr. Cerza admitted that if you meet unexpected resistance, you should stop. Dr. Doblar and Dr. Woodruff said the same thing.

. . . .

[Mr. Brock] testified that what he saw was Dr. Cerza insert the tube, stopped, his hand turned white, he grunted, and he pushed more. [Nurse] Samples testified that he saw Dr. Cerza push the tube all the way down until the Y was in Mrs. Hensley's mouth. And you saw the length of that tube and you saw the size of Mrs. Hensley and you saw the demonstration that Dr. Doblar did with respect to that and how you can't do that without forcing it and tearing something really bad.

While the trial court erred in limiting plaintiff's counsel's argument, we believe this error probably did not affect the judgment and therefore consider it harmless.

SCOPE OF EXPERT TESTIMONY

Ms. Hensley argues that the trial court erred in allowing testimony from the defendants' experts that was not included in their expert witness disclosures, in violation of an agreed order regarding the scope of expert witness testimony. The agreed order states, in pertinent part: "Expert witness testimony shall be limited to the scope of the parties' Rule 26.02(4)(A)(i) disclosures and discovery depositions."

We review a trial court's decisions regarding the admission or exclusion of evidence under an abuse of discretion standard. *Brown*, 181 S.W.3d at 274; *Mercer*, 134 S.W.3d at 131. Ms. Hensley argues that the trial court erred in failing to exclude the evidence as a discovery sanction for the defendants' purported failure to abide by the agreed order. Even if we view the issue in that light, however, the appropriate standard of review is abuse of discretion. *See Buckner v. Hassell*, 44 S.W.3d 78, 83 (Tenn. Ct. App. 2000). Ms. Hensley offers no authority, and we know of none, for her assertion that the determination of whether the defendants violated the agreed order is a question of law and thus should be subject to de novo review.

Ms. Hensley specifically objects to the trial court's admission of testimony regarding two topics: Dr. Cotten's and Dr. Woodruff's testimony that Ms. Hensley's trachea was unusually narrow, and Dr. Grimball's testimony about the theory that Ms. Hensley's trachea tissue "unzipped" when Dr. Cerza advanced the double lumen tube with an appropriate amount of force.

As their first line of defense, the defendants argue that Ms. Hensley waived these objections by her failure to raise them in a timely manner. A party must raise a timely and specific objection to the introduction of evidence in order to preserve the issue for purposes of appeal. Tenn. R. Evid. 103(a)(1); *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 702 (Tenn. Ct. App. 1999). The defendants argue that since no objection to the testimony regarding the narrowness of Ms. Hensley's trachea and the unzipping theory was raised when it was first presented to the jury in opening arguments, she waived her right to object on appeal. We find this argument unconvincing since Ms. Hensley's objection was not to the opening arguments themselves but to anticipated testimony described therein by the defendants.

Ms. Hensley brought up her objection regarding the anticipated testimony on trachea narrowing prior to Dr. Cotten's and Dr. Woodruff's testifying. As to the unzipping theory, however, we find no objection by Ms. Hensley to that testimony. In describing to the court its proposed rebuttal testimony by Dr. Doblar, plaintiff's counsel stated: "We're going to ask about Dr. Grimball's theory, which was not disclosed to us, about that you can poke a hole in the trachea and it will unzip." This statement occurred after Dr. Grimball had testified and does not constitute an objection. In an attempt to justify her failure to object, Ms. Hensley asserts that, in light of the court's ruling on her initial objection (regarding the trachea size testimony), any other objections would have been futile. We disagree with this analysis because, with respect to each topic of testimony–i.e., the size of the trachea and the unzipping theory, the trial court would have to make a separate determination as to whether the testimony was within the scope of the expert witness disclosure. Since no objection was raised, the trial court was never asked to make such a determination with respect to the unzipping theory. We deem that objection waived.

We now proceed to address the substance of Ms. Hensley's assignment of error regarding the trial court's admission of testimony on the narrowness of the trachea.[3] Dr. Cerza's expert witness disclosure, filed on July 25, 2009, regarding Dr. Cotten, a radiologist, contains the following statements:

> Dr. Cotten will address issues regarding causation. Dr. Cotten will discuss the size of the goiter and the images taken of Ms. Hensley.

---

[3]Ms. Hensley did not depose either Dr. Cotten or Dr. Woodruff. As Ms. Hensley emphasizes, the parties were required to disclose all expert witnesses and the opinions to which they would testify and to supplement those disclosures with any relevant changes. Tenn. R. Civ. P. 26. We disagree, however, with her suggestion that, by choosing not to depose these witnesses, she restricted the scope of their testimony.

Dr. Cotten is prepared to testify that the anesthesia preoperative evaluation indicates that Dr. Cerza was aware of the thyroid mass. He concurs with the testimony of Dr. Wilson that the deviation of the trachea was slight. Further, the size of the trachea appears normal. Accordingly, it is Dr. Cotten's expert opinion that, as a radiologist, he would not have characterized the size of Ms. Hensley's goiter or the degree of deviation of Ms. Hensley's trachea as preclusive of intubation.

The disclosure on Dr. Woodruff, an anesthesiologist, includes the following pertinent description:

Ms. Hensley had a C.T. scan ordered by her referring physician Dr. Lawrence, who is a specialist in ear, nose and throat. Neither Dr. Lawrence's nor the radiologist's review of that imaging study indicated that there was a significant displacement of the trachea or that the trachea itself was smaller than normal. . . . There does not appear to be anything from the imaging studies, medical records or visual examination of the airway by Dr. Cerza that would have contraindicated the plan to use a double lumen tube for surgery.

Prior to Dr. Woodruff's and Dr. Cotten's taking the stand, Ms. Hensley objected to testimony described in Dr. Cerza's opening statement indicating that, according to measurements not usually performed by radiologists, Ms. Hensley's trachea was unusually narrow. After the trial court overruled Ms. Hensley's objection, Dr. Cotten initially testified, based on CT imaging from February 26, 2004, that he considered the deviation of Ms. Hensley's trachea to be "minimal or mild," that he did not find anything that would preclude intubation, and that he did not see any significant tracheal narrowing. Based upon one of the CT images that included measurement markings, Dr. Cotten was asked to tell the diameter of the trachea, and he answered that it was 11 millimeters. On cross-examination, Dr. Cotten gave the following testimony:

Q. And I think you said that the reports appropriately didn't report tracheal narrowing because there wasn't significant tracheal narrowing.

A. Yes, sir.

Q. And would it be fair to say that the size of the trachea appears normal?

A. I would probably not use those words. I would say that the size of the trachea is not narrowed, and I know that's sort of–no, that's not what I would say, I'm sorry. Is the size of the trachea normal?

-12-

Q. Does it appear normal, I should say.

A. I would have to say on first reading of the report that it did appear essentially normal, but retrospectively looking back at the films, knowing what was coming up, if you look at it, it is a little narrowed.

Q. All right. So just to be clear, are you saying that it does appear normal, or it doesn't?

A. Well, I'm saying that on initial viewing of it, if I was reading that examination in a stack of 30 CT exams, that I would not have commented on the trachea being narrowed, but if you measure it, it measures 11 millimeters across.

Q. Would that be normal?

A. It is–well, there is a large range of normal, depending on how old you are and your physical condition and if you have COPD, so that would be–I don't think the trachea is normal.

Dr. Woodruff was the next witness. He testified as follows:

Q. Will any size double lumen tube fit through 11 millimeters of space?

A. No. A 35 left double lumen tube has 12 millimeters and a 37 would be 12.6 millimeter diameter. So if you took that tube right there and you cut it, and I got a ruler here, you can measure, and it's going to have 12 and 12.6 across, neither of those tubes is going to make it in there.

Q. Even if Dr. Cerza had chosen the smallest tube available on the market in March of '04, this trachea had narrowed to the extent that the tube would not fit in it?

A. It's a millimeter too big.

When read together, the testimony of Dr. Cotten and Dr. Woodruff support Dr. Cerza's theory that the tube was too large for Ms. Hensley's trachea. Their expert disclosures, however, state that the size of Ms. Hensley's trachea appeared normal and there seemed to be no contraindication to intubation. Tenn. R. Civ. P. 26.02(4) addresses discovery of the opinions of experts. Through interrogatories, a party is entitled to require

-13-

the other party to identify any expert the other party expects to call as a witness, "to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion." Tenn. R. Civ. P. 26.02(4)(A)(i). A party has a duty to supplement discovery responses with respect to "the subject matter on which the [expert witness] is expected to testify, and the substance of that testimony." Tenn. R. Civ. P. 26.05(1). The expert witness disclosures at issue supplemented Dr. Cerza's interrogatory responses. Dr. Cerza did not, however, supplement the expert witness disclosures to include the new facts and opinion reflected in Dr. Cotten's testimony concerning the narrowness of Ms. Hensley's trachea. We have concluded that the trial court erred in finding this testimony to be within the scope of the disclosure.

We must proceed to determine whether this error "more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b). Ms. Hensley's argument is that she was prejudiced because although she had "notice of most of the facts underlying the undisclosed opinions, she did not have notice of the expert witnesses' interpretations of those facts." Thus, she asserts that she was prejudiced because she was not aware that Dr. Cotten would opine that Ms. Hensley's trachea was unusually narrow, so narrow that the introduction of a double lumen tube would inevitably result in injury. (Because Dr. Cerza was not aware of this fact, the defense theory goes, he was not at fault.)

In evaluating the effect of the trial court's admission of the testimony at issue, we find certain evidence to be of particular significance. The deposition testimony of Dr. Lewis Wilson, the cardiovascular surgeon who performed emergency surgery to repair the tracheal tear, was read to the jury at trial. In his deposition, Dr. Wilson stated:

> [W]hen we look back at the films, it was clear that her trachea was smaller than you would expect for somebody her age and size, adult. And, of course, we tried to use an endobronchial tube which is bigger than our regular endotracheal tube. So in retrospect, for this patient, this probably was not the best tube.

This testimony gave Ms. Hensley notice that the size of her trachea was a potential issue in the case. Dr. Doblar, plaintiff's expert anesthesiologist, gave the following testimony (prior to the defendant's experts testifying) as to why he changed his opinion regarding whether Dr. Cerza had deviated from the standard of care:

> Based on review of the scans and reading deposition testimony and of all the people involved, knowing what Dr. [Lawrence] said about the small trachea

-14-

and knowing Ms. Hensley's size and the size of the double lumen tube that was used, Dr. Cerza applied too much force to the breathing tube.

Moreover, after the testimony from Dr. Cotten and Dr. Woodruff came in, Ms. Hensley put on rebuttal testimony from Dr. Doblar to the effect that, if the patient's trachea were narrowed to the extent stated by Dr. Cotten, Dr. Cerza would have encountered more than normal resistance when he attempted to introduce the double lumen tube and, in order to insert the tube, would have had to use too much force.

Looking at all of the evidence considered by the jury, we cannot conclude that the error in admission of evidence more probably than not affected the outcome.

### DISMISSAL OF NEGLIGENT RETENTION CLAIM

The initial issue to be addressed with respect to the negligent retention claim is whether Ms. Hensley filed a timely notice of appeal. The trial court granted the defendants' motion for partial summary judgment and dismissed the negligent retention claim on March 9, 2009. The case proceeded to trial before a jury, and the court entered judgment on April 13, 2009. Ms. Hensley filed a motion for a new trial, which was denied by the trial court on August 31, 2009. The defendants argue that the negligent retention claim was not decided by the jury and was not a proper subject to be addressed in the motion for new trial. Rather, they argue, the judgment on the negligent retention claim became final on April 13, 2009, and the notice of appeal was due within 30 days, by May 13, 2009.

As the defendants emphasize, this court lacks subject matter jurisdiction over a case in which the appellant fails to timely file a notice of appeal. *Ball v. McDowell*, 288 S.W.3d 833, 836 (Tenn. 2009). Pursuant to Tenn. R. App. P. 4(a), a notice of appeal with regard to an appeal as of right "shall be filed with and received by the clerk of the trial court within 30 days after the date of entry of the judgment appealed from." If a party files certain motions, including a motion for new trial, "the time for appeal for all parties shall run from the entry of the order denying a new trial or granting or denying any other such motion." Tenn. R. App. P. 4(b). Citing Tenn. R. Civ. P. 59.07,[4] the defendants argue that the trial court could not properly grant a motion for new trial regarding the negligent retention claim, and therefore, with respect to that claim only, the notice of appeal was due 30 days from the April 13, 2009 judgment. We cannot agree with the defendants' interpretation of the rules governing the timely filing of an appeal.

---

[4]Tenn. R. Civ. P. 59.07 states: "A new trial may be granted ... on all or part of the issues in an action in which there has been a trial by jury . . . ."

The defendants' interpretation conflicts with the language of Tenn. R. App. P. 4(b), which does not distinguish between issues subject to the post-trial motion and those that are not. Tenn. R. App. P. 4(b) operates to "suspend[ ] the operation of the thirty-day rule while certain timely filed post-trial motions are pending with the trial court." *Gerakios v. Gerakios*, No. M2009-01309-COA-R3-CV, 2010 WL 2612684, at *1 (Tenn. Ct. App. June 30, 2010). In *Evans v. Wilson*, 776 S.W.2d 939 (Tenn. 1989), the plaintiffs filed several motions encompassed in the tolling provisions of Tenn. R. App. P. 4(b). *Id.* at 941. The trial court had ruled on some of these motions but not on the motion for new trial. *Id.* In dismissing the appeal, our Supreme Court cited the comments to Tenn. R. App. P 4(b), which state in pertinent part:

> These tolling provisions may unduly lengthen litigation if such motions are not ruled on promptly by the trial court. However, unless these motions are abolished, it would be undesirable to proceed with the appeal while the trial court has before it a motion the granting of which would vacate or alter the judgment appealed from, and which might affect either the availability of or the decision whether to seek appellate review.

*Id.* at 942. The Supreme Court concluded that as "long as such a motion [specified in Tenn. R. App. P. 4(b)] is pending, there is no final judgment for purposes of T.R.A.P. 3(a)." *Id.* Citing the problem of piecemeal appeals and lack of certainty if it were to hold otherwise, the Supreme Court held that "the time for appeal does not begin to run until the trial court has disposed of all the timely filed motions specified in Rule 4(b)." *Id.* While the present case does not involve multiple motions, the same policy considerations are applicable with respect to claims not encompassed in a motion for a new trial. The trial court's granting of the defendants' motion for partial summary judgment was not final until the motion for new trial was resolved.

We conclude that Ms. Hensley's notice of appeal was timely filed with respect to all claims, including the negligent retention claim.

Ms. Hensley's complaint includes a claim against CAS for negligent retention. Under this theory, she asserts that CAS "breached its duty to Plaintiff by retaining Defendant Cerza and by making him available to perform anesthesiology services for Plaintiff." The defendants moved for partial summary judgment on this claim, and the trial court granted the motion and dismissed the claim. While the trial court's order does not specify the reasons for this ruling, the defendants argue on appeal that there was no claim for negligent retention, as a matter or law because Dr. Cerza was not an employee or independent contractor of CAS. We need not, however, resolve this question. Even if Ms. Hensley could have made a proper claim for negligent retention under the facts of this case, the issue is now moot because the

trial resulted in a judgment in favor of the defendants.[5] There is, therefore, no basis for a claim for negligent retention.

CONCLUSION

The judgment of the trial court is affirmed. The costs of appeal are taxed against Ms. Hensley, and execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE

---

[5]As the defendants conceded at oral argument, their issues regarding the denial of their motions for a directed verdict are also moot.